CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF
NEW YORK

2017 JUN 19  A 10: 57

RECEIVED

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------X

In Re:  Samuel Racer,

               Debtor,

Rita Shamshovich,

               Plaintiff,

    -against-

Samuel Racer,

               Defendant,

-----------------------------X

STATE OF NEW YORK   )

              ss;

COUNTY OF KINGS     )

**Case No. 1-16-41843**

Chapter 7

Adv. Proc No. 1-16-01146-cec

**AFFIDAVIT IN OPPOSITION
TO PLAINTIFF'S MOTION**

Hon. Carla E. Craig

RECEIVED  2017 JUN 19  A 10: 57  U.S. BANKRUPTCY COURT EASTERN DISTRICT OF NEW YORK CLERK

       SAMUEL RACER, duly sworn deposes and says:

    1.    I am the Debtor-Defendant *Pro Se* in this proceeding.
I make this affidavit in opposition to plaintiff's motion
seeking an order granting the plaintiff-creditor, Rita
Shamshovich, summary judgment against the debtor-defendant,
Samuel Racer, in the above-entitled proceeding.

    2.    The position and relevant arguments of the
plaintiff-creditor in support of her motion are succinctly,
although erroneously and inaccurately stated in her Memorandum
of Law.

    3.    The relevant issues will be addressed in this
affidavit in the order that they are stated in the Memorandum

of Law.

Breach of Fiduciary Duty and "Defalcation"

    4.    The issue of "fiduciary duty" has not been litigated or adjudicated in any forum, judicial or administrative. The only tribunal that dealt with the alleged "breach of fiduciary duty," was the Departmental Disciplinary Committee, which made a determination after extensive review of all of the relevant documents, and came to the conclusion that nothing more than ethical violations occurred and nothing more serious than "an admonitions" was warranted as punishment. (see Ex."H," Defendant's Motion to Dismiss)

    5.    The plaintiff's complaint in the State Action (see Ex. "B," Defendant's Motion to Dismiss) at paragraph 55: "FIFTH CAUSE OF ACTION" stated: "Defendants and Wiseman each had a fiduciary duty to plaintiff, which duty they breached." Nothing further is alleged concerning this claim.

    6.    In her present motion, plaintiff claims that the defendant was "found liable for breach of fiduciary duty in the litigation from which the Judgment arose." This is plainly and totally false. As stated previously, there was never any determination of any kind and no finding of liability on this issue, especially since the litigation concluded ten years before the judgment was entered, with a default before a Judicial Hearing Officer under protest, with no evidence presented, no testimony taken and a nonexistent transcript.

(see Ex. "E," Defendant's Motion to Dismiss)

This is corroborated by the facts that the plaintiff and/or her lawyers never contradicted it; never came forward with any evidence post-inquest or at other time, except with a feeble attempt within the adversary proceeding in Bankruptcy Court. Apparently, the plaintiff belatedly wants to litigate this issue in this court and hopes to get a favorable determination.

7.    The plaintiff never challenged these facts and never came forward with any evidence or testimony which could have been but was not presented at the September 6, 2000 inquest, because it did not and does not exist.

8.    The monetary amount that was assigned in the default judgment does not arise from a determination of damages due to an alleged "breach of fiduciary duty" as the plaintiff belatedly tries to created by the use of smoke and mirrors. The judgment amount arose from an attempt to settle the state case between Shamshovich and Shvartsman before Supreme Court Justice Joseph Dowd in the presence of two attorneys. The Stipulation was "So Ordered" by the Court and on page 5 thereof it plainly stated:

**"Mr. Racer is not due to make any payments** according to the schedule, and he'll be dismissed as well on receipt of the last payment from Shvartsman." (emphasis added)

(see Ex. "C," Defendant's Motion to Dismiss)

9.    Thus, the Stipulation of Settlement, clearly shows

that I did not owe anything to the plaintiff, did not guaranty any payments of the defendant, SHVARTSMAN, and had no obligation to the plaintiff in any manner whatsoever. From Shvartsman's default, a money judgment resulted, which Shamshovich chose to temporarily ignore and/forgive Shvartsman and chase the undersigned.

10.    Interestingly, the Stipulation did not address or even mention the shares of stock purportedly held by RACER in escrow nor did Shamshovich demand the stock or request a court order directing the delivery of the shares of stock (alleged "collateral") to her or her attorney to satisfy the debt. This was so because such shares were not only worthless but no longer relevant in the business dealings between Shamshovich and Shvartsman, having been replaced by other shares from other entities and ultimately satisfied by a delivery and acceptance of a valuable consideration. (see below)

11.    As shown by the sworn affidavits of Shvartsman, his debt to Shamshovich was later addressed and satisfied through a forced payment in the form of jewelry and other valuables listed in a receipt issued by Ms. Shamshovich as a result of an extra-judicial "sit down" arranged by Ms. Shamshovich. (see Ex. "G," Defendant's Motion to Dismiss)

12.    The plaintiff repeatedly makes reference to a certain "Security Agreement." It is not identified nor attached, again, because it does not exist. Furthermore, the

repeated allegations that the shares of stock were held as
"collateral as security for repayment" is a convenient
fabrication. It would imply that the shares of stock were
worth at least as much as the debt of almost $300,000. In
actuality, as shown by the dealings and the documents
generated by the parties, the stock had no value whatsoever.

13.   The alleged debt of Shvartsman to Shamshovich is
memorialized in a simple Agreement, dated 16th day of February
1989 between the plaintiff and co-defendant, SHVARTSMAN, in
the State action (Ex. "D," Defendant's Motion to Dismiss)
which  states:

> "…SHVARTSMAN acknowledges a debt to  SHAMSHOVITS in the
> sum of $279,500., which he is obligated to repay on
> August 3, 1989 with interest included therein."
>
> 'Until such time that all of the sums owed by one party
> to the other, and vice versa, are paid in full, the
> respective shares of stock owned by SHVARTSMAN and
> SHAMSHOVICH shall be held in escrow by SAMUEL RACER,
> ESQ...'

14.   There are no elements of any fiduciary duty to
either party stated or implied in the document. There is no
provision that anything is collateralized or secured; it
merely states that there is outstanding business that needs to
be attended to at a future time.

15.   This, in fact, occurred on November 4, 1989 when
Ms. Shamshovich unilaterally signed a sworn affidavit,
prepared and notarized by her lawyer, which read as follows:

"I have entered into an Agreement with Yakov Shvartsman
to exchange all my shares in All Purpose Bazaar Corp. for
shares of another corporation. All that remains to be done
under said Agreement is the exchange of actual shares."

(See Exhibit "1,") attached hereto and made a part hereof)

This document shows that all outstanding dealings between Ms.

Shamshovich and Mr. Shvartsman had been completed and the

shares of stock held by me as listed on a receipt dated

February 3, 1989 became irrelevant and the receipt moot. (See

Exhibit "2," attached hereto and made a part hereof)

16.    In addition, all of the relevant business between

them were further finalized by and in an agreement dated

"5/18/89" wherein I did not participate and played no role

of any kind. (See Exhibit "3," attached hereto and made a part

hereof)

17.    The plaintiff's-creditor's attorney rolls all of

the "semi-ancient" agreements entered into by Shamshovich and

Shvartsman into one bunch, randomly supplements them with the

correspondence had among the relevant players and comes to a

conclusion which he wants the Court to adopt, that "the

defendant intentionally or recklessly breached the express

terms of the [nonexistent] Security and [irrelevant] Escrow

Agreements," thus being guilty of "defalcation."

18.    The plaintiff's-creditor's attorney boldly cites

*In re Mayo,* 2007 WL 2713064 as the source of the "new

defalcation standard," which is defined therein as "knowing

misconduct."

19.    However, the United States Supreme Court views the term "defalcation" differently: as where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, 'defalcation' requires an intentional wrong. An intentional wrong includes not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as equivalent." *Bullock v. BankChampaign, N.A.* 2013 U.S. LEXIS 3521 (May 13, 2013), 630 F.3d 1160 (5th Cir.2012), "...interpreting 'defalcation'" as similar to..."embezzlement," "larceny," and "fraud," which all require a showing of wrongful felonious intent." See *Neal v. Clark*, 95 U.S. 704, at 709.

20.    As to "fraud," In *Sharp International Corp. v. State Street Bank*, 281 B.R. 506 (Bankr. E.D.N.Y. 2002) affirmed 302 B.R. 760 (E.D.N.Y. 2003), Hon. Carla E. Craig held that FRCP 9(b) requires that the plaintiff must allege all of the necessary elements of the fraud committed by the defendant with particularity, and that a failure to support all of the necessary elements of the fraud with particular factual allegations renders the complaint insufficient as a matter of law, mandating a dismissal. This, most appropriately applies to the complaints pleaded by the plaintiff in the state action and twice in this proceeding.

Collateral Estoppel:

21.    Collateral estoppel, an equitable doctrine, is based upon the general notion that a party, or one in privity with a party, should not be permitted to relitigate an issue decided against it. Gramatan Home Investors Corp. v. Lopez, 46 N.Y.2d 481, 485, 414 N.Y.S.2d 308, 386 N.E.2d 1328; Kaufman v. Lilly & Co., 65 N.Y.2d 449, 455, 492 N.Y.S.2d 584, 482 N.E.2d 63. As this doctrine has evolved, only two requirements must be satisfied. First, the party seeking the benefit of collateral estoppel must prove that the identical issue was necessarily decided in the prior action and is decisive in the present action. Kaufman v. Lilly & Co., supra, at 455, 492 N.Y.S.2d 584, 482 N.E.2d 63.  Second, the party to be precluded from re-litigating an issue must have had a full and fair opportunity to contest the prior determination. The burden is on the party attempting to defeat the application of collateral estoppel to establish the absence of a full and fair opportunity to litigate. id., at 455-456, 492 N.Y.S.2d 584, 482 N.E.2d 63.  Collateral estoppel is grounded on concepts of fairness and should not be rigidly or mechanically applied. Matter of Halyalkar v. Board of Regents, 72 N.Y.2d 261, 268-269, 532 N.Y.S.2d 85, 527 N.E.2d 1222.

22.    Thus, in this case, the Court needs to decide whether the two basic requirements for invoking collateral estoppel have been satisfied: (1) that the identical issue was necessarily decided in the prior proceeding and is decisive of

the present action, and (2) that there was a full and fair opportunity to contest that issue in the prior proceeding (see, Matter of Halyalkar v. Board of Regents, supra, 72 N.Y.2d at 266, 532 N.Y.S.2d 85, 527 N.E.2d 1222; Schwartz v. Public Adm'r of County of Bronx, 24 N.Y.2d 65, 71, 73, 298 N.Y.S.2d 955, 246 N.E.2d 725). Here, there can be no doubt that the "full and fair opportunity" requirement is not satisfied by far. Indeed, the defendant did not even get to the threshold of litigating the issues raised in this lawsuit. The matter was referred to a Judicial Hearing Officer who took no evidence or testimony from either side, merely rendering his written Decision, which stated nothing other than a monetary amount. (see Ex. "E," Defendant's Motion to Dismiss)

23. To reiterate, this is corroborated by the plaintiff's and/or her lawyers' silence on this issue; their failure to contradict it; their failure to come forward with any evidence allegedly presented at the inquest or at any other time, except with an attempt at present, in Bankruptcy Court.

24. In this action, the Defendant, had no opportunity to depose the plaintiff or conduct adequate discovery despite a court order because of the plaintiff's intentional dilatory tactics.

Baseless Accusations of "Bad Faith" Section 707(A):

25. The bad faith alleged against the defendant

-debtor is, in fact, being manifested by the plaintiff
-creditor.

      26.    The plaintiff-creditor distorts the
chronology and intimates that she obtained her judgment on the
eve of the instant filing. This is not only false but
egregiously improper even to suggest.

      27.    An accurate chronology of events is as
follows: the sham claim against Samuel Racer dates back to
business dealings between the plaintiff and her colleague,
Yakov Shvartsman, commenced in the late 1980's. A lawsuit in
State Supreme Court and a disciplinary complaint against
Samuel Racer date back to 1994-1995. A default money judgment
was wrongfully and/or mistakenly awarded on September 6, 2000
at an inquest which took 15 minutes without any evidence
presented or testimony taken. The judgment was not entered in
the County Clerk's office of the New York State Supreme Court,
Kings County until October 1, 2010. The Petition herein was
filed on April 28, 2016. The commencement of the Adversary
Proceeding followed on August 8, 2016.

      28.    It is not uncommon for lawyers to resort to
hyperbole in acting as advocates for their clients. However,
in this case perhaps due to the fact that the plaintiff's-
creditor's attorney is her son, the advocacy has overstepped
such bounds. To help and perhaps impress his mother, his
zealousness has pushed him to the point of distorting the

truth.

29.    Attorney, Shamshovich, argues "bad faith" under Section 707(A) by accusing the defendant-debtor of the six criteria advanced by *In re Griffith*, 209 B.R. 823 (Bankr. N.D.N.Y. 1996):

(1) debtor's manipulations:

The argument that the defendant-debtor manipulated Ms. Shamshovich is almost comical. She was the one who commenced a lawsuit against a lawyer who never represented her, never took any money or valuables from her, never advised her or undertook to protect her interests etc. She pursued the lawsuit despite the fact that a most respected tribunal which regulates attorneys' conduct, after a thorough investigation, came to the conclusion and advised her that the lawyer did nothing wrong other than violate some ethical rules of professional behavior which caused her no monetary loss or damage. She initially forgave and discontinued the lawsuit against Mr. Shvartsman who apparently defrauded her to the tune of approximately $300,000. Thereafter, she turned to criminals in order to extort from Mr. Shvartsman a treasure trove of such items as "a watch with diamonds," "a Patek Phillipe watch,"  "2 rings with diamonds," "3 women's Cartier rings with diamonds," "set of Cartier earrings, ring and bracelet," "a gold medallion," "4 gold chains with 2 charms," "a bracelet and a yellow diamond."

Neither the plaintiff-creditor, nor her lawyer (son) deny any of this or in any way contradict, Yakov Shvartsman's version of the events.

When she appeared at the inquest before a JHO, she presented no evidence and did not testify. After having succeeded at the inquest in September 2000, she did absolutely nothing for ten years until October 2010, when she presented a default money judgment for entry at the Supreme Court Kings County Clerk's office.

It seems that the manipulation took place on the other side and not by the defendant-debtor.

(2) absence of an attempt to pay creditors:

Obviously the plaintiff—creditor and her lawyer have no knowledge of whether the debtor paid and/or made attempts to pay any of the creditors other than this creditor. Thus, this accusation has no basis or merit because to the extent and until such time as the defendant-debtor was able, certain creditors were paid.

(3) failure to make significant lifestyle changes:

Again, the plaintiff-creditor and her lawyer have no knowledge as to the details of the debtor's lifestyle other than point out a one trip taken in the last three years and one purchase made by the creditor's spouse from whom he is separated.

Still, this argument is disingenuous because after having

subpoenaed and reviewed all of the creditor's bank records,
[and the bank accounts of the debtor's spouse], the
plaintiff's-creditor's attorney is in a position to
determine and even confirm (if he were objective and fair)
that the creditor's primary source of income is his social
security benefits; that rather than drive a purchased Mercedes
Benz automobile, he drives a leased Jeep; that rather than
lease a professional office on West 57th Street in Manhattan,
he does part-time work out of a rented 100 square-foot
location in Sheepshead Bay, Brooklyn; that rather than wear
designer clothes, he has not purchased an article of clothing
in over 6 years; and, a list of such examples can continue
into volumes.

As far as the emphasis on a trip to Aruba goes, a $550.
expense into an airline ticket by a 67-year old diabetic heart
patient who occasionally cares for his 95-year old amputee
father and a 67 year-old wife-friend under treatment for
lymphoma and Parkinson's, to be a guest of a relative on a
Caribbean island for one week can be easily explained by the
fact that even healthy farm animals get to rest.

(4) <u>debtor has sufficient resources</u>:

Even the creditor must admit that this claim is
ridiculous! This can be demonstrated by the following
question: If the debtor-defendant had "sufficient resources,"
would he allow a foreclosure of the family residence to occur

and in the process accumulate debts in excess of the market value of the house?

If the plaintiff's-creditor's attorney genuinely believes that the debtor-defendant has "adequate resources," after having conducted an exhaustive investigation and inquiry into the debtor's-defendant's income and assets over the last several years, he should immediately point them out. It seems unnecessary to point out that if such "resources" existed and were available that the trustee in this case would have publicized them.

The "sufficient resources" argument appears to be an empty shell.

(5) debtor inflates expenses to disguise financial well-being:

Which expenses? How inflated? Is real estate "foreclosure" and exorbitant borrowing the **new** definition of financial well-being?"

The amounts "borrowed" from relatives over an extended period of time are real and listed in the Petition with the intent to be truthful and correct.

The sums received from parents, in-laws, sister and cousin were, in fact, financial assistance to a person genuinely in financial distress due to inability to practice his profession since November 2008. For the most part, I suspect that these people do not expect to get reimbursed;

however, if they were not disclosed and were later discovered by a creditor or the trustee, the debtor would have been accused of concealment. Thus, is the debtor to be punished for being truthful?

(6)    debtor over utilizing the Code...

The attorney for the plaintiff-creditor attempts to pull the wool over the Court's eyes by accusing the defendant-debtor of conducting "long and sordid . . . litigation [lasting] two decades..."

The true and accurate chronology of all litigation events is stated above. The only significant delay (lapse) was caused by the plaintiff's failure to enter the judgment for a period of exactly ten years during which the plaintiff nothing to advance the litigation. If the plaintiff, who was represented by counsel, had acted in a timely manner, an appeal of the sham inquest result would have been possible and successful, thereby avoiding any further litigation from the year 2000 on.

The accusation that the debtor is not an "honest but unfortunate" debtor is plain vicious.

The plaintiff-creditor has been attacking the defendant-debtor in excess of twenty years over a loss that she sustained through her own greed, gullibility, avarice and stupidity. The lawyer, if any, responsible for her loss, if any, is the one who improperly represented her in her dealings

with Mr. Shvartsman. The true culprit however was, in fact,

Yakov Shvartsman with whom she had a very close relationship

independent of any involvement by attorney, Racer, and

with whom she made the ultimate deal under the auspices of the

Russian mob, whom she employed and brought to the table.

30.    The claim that discharge must be denied under

Section 727(a)(2)(A) is without merit.

The circumstances under which the transfers of the

real property in question were fully explained to the trustee

at the very first creditors' meeting as well as subsequently

at a deposition and in a subsequent creditors' meeting.

Most significantly however, it was established and

documented that the home known as 2330 East 70th Street,

Brooklyn, New York was purchased with funds advanced by the

parents of the debtor's now-estranged wife, ELSA (SZPANDERFER)

RACER for her benefit. Practically speaking, from the time of

acquisition in 1979, the home always belonged to her. Attached

hereto and made a part hereof as Exhibit "4" are copies of a

series of checks provided by ELSA (SZPANDERFER) RACER's

parents, which equaled the sum over and above the then-

existing mortgage that was assumed by the grantees at the time

of purchase. Also, attached as Exhibits "5" and "6",

respectively are copies of the original closing statement and

a letter from the mortgagee bank, showing the outstanding

balance on the mortgage. The aforementioned checks covered the

difference.

31.    Initially, the deed to the home was in the names of ELSA RACER and SAMUEL RACER as husband and wife. However, since December 18, 1996 the deed to the home has been solely in the name of ELSA RACER who due to the source of the original funds was and remains the sole owner of the home.

32.    The deed transfers that occurred between 1996 and 2009 had nothing to do with the judgment or the lawsuit against the debtor. The 2009 transfers, for example, were nothing more than convenience transfers for the purpose of mortgaging the property wherein the debtor who that time was, the working spouse, responsible for the support of his wife, was added to the deed in order to assist in mortgaging of the property, which occurred contemporaneously.

33.    The aspersion that there is something nefarious about the fact that the debtor continues to reside in a three level, three bedroom house with separate entrances to two of the levels, despite being separated from his spouse can be explained by the terms of a marital agreement; in addition, at the deposition of the debtor (Exhibit "42" to the plaintiff's motion), it was explained (and later documented) that my estranged spouse is undergoing chemical treatment for lymphoma and also suffers from Parkinson's disease; after having been married to her for over forty years, I volunteered to be her part-time care-giver on a daily basis and thus need to be

close to her.

34.    The allegation that the plaintiff's judgment was obtained in February, 1995 is a total distortion. As documented within, the money judgment, was entered on October 1, 2010, pursuant to an inquest held on September 6, 2000. Both exhibits are before the Court.

35.    The plaintiff's-creditor's attorney side-steps the information in his possession in the form of an acknowledged marital agreement dated August 21, 2009 between the debtor-defendant and his estranged wife, which further explains why the house is and rightfully belongs in her name. A copy of the said agreement, a copy of which is attached hereto and made a part hereof as Exhibit "7" has been provided to the plaintiff's attorney as well as the trustee. The agreement states a partial consideration for the real estate transfer (see Articles III & VI), although, as stated and documented above, equitably the house was always hers.

36.    The attempt to apply the "doctrine of continuing concealment" to the real estate transfers is equivalent to an attempt of fitting a square peg into a round hole. It is a matter of public records that the house is "under water." As sad as it is, the house was, in fact, under water during the storm "Sandy." Now it is mortgaged beyond its market value and in foreclosure. A summary of the encumbrances on the house is contained in the Amended

Petition, Schedules E/F. (see Exhibit "59" to the plaintiff's motion)

37.    As obvious as it is that "concealment" would be futile and meaningless, the plaintiff's attorney in his over-zealousness proceeds with his argument, nevertheless.

38.    The plaintiff's attorney, in his motion, lists 10 items, contained in the Petition, which he claims are "false," warranting a denial of discharge.

39.    First of all, it must be noted that although the Petition was signed by the debtor, it was prepared by his attorney, ELENA GELMAN, ESQ., who was subsequently relieved, but on whom he relied in preparing and filing the Petitions.

40.    Second, to the extent that the Petition was inexact and/or wrong, none of the misinformation was intentional, as explained below:

1.    The alleged "concealment" of the residence was explained above;

2.    The vehicle driven by the debtor, primarily to work, is leased by the spouse and the lease guaranteed by his sister; [information given to attorney Gelman]

3.    Racer Real Estate & Consulting Inc., is a corporation under which the debtor works part-time as a real-estate closer, almost exclusively gratuities in an average sum of $250. per closing which deposited into a checking account at Citibank. [information given to attorney Gelman]

3a.    Kings Capital Consulting, Inc., was a defunct Corporation with an account, now closed, containing several hundred dollars. [omitted through an oversight].

4.    Because the lease for 100 a square-foot office at 1733 Sheepshead Bay Road, Brooklyn, New York 11235 is held in the name of Racer Real Estate and Consulting, Inc., the

security deposit was omitted through an oversight, although disclosed to attorney Gelman.

     5.    The lawsuit in question was a meaningless reaction by the debtor in a squabble with the landlord at the latter premises. It was discontinued without any compensation or concession by either party. It should have been listed, but was unintentionally omitted because of its insignificance.

     6.    This counterclaim was void *ab initio* and should have never been interposed by Ms. Gelman in this proceeding.

     7.    Please see #3a above.

     8.    Please see #4 above.

     9.    The debt/mortgage with Net Capital LLC was disclosed in the Petition, through inadvertence, it was overlooked that the mortgagee had started a foreclosure action.

     10.    The assumption that none of the family members would not seek the repayment of the debts to them is a mere supposition. The debtor does not have actual knowledge that this is the case, except where the statute of limitation may be applicable. The only debt that would not be claimed for certain is the one to father-in-law, Herman Szpanderfer, who is now deceased.

     Once these inadvertent and unintentional inaccuracies came to light, they were immediately corrected through Amended Petitions. To characterize them as "perjury" is just wrong and unfair.

     41.    Whereas, the plaintiff-creditor is totally with "unclean hands," having produced nothing of substance in the course of discovery and having manipulated herself out of a court-ordered deposition, the defendant-debtor subjected himself to a day-long deposition with a transcript consisting of 300 pages. (Exhibit "42" to plaintiff's motion) In the course of said deposition he answered every question posed to him without interposing any objections or asking for any

rulings.

42.    Page 299 of the deposition transcript, attached hereto and made a part hereof as Exhibit "8" shows a list of "REQUESTS" made by the plaintiff's attorney, which were in addition to previously requested documents, interrogatories and Notice to Admit. All of the items were provided shortly after the deposition.

43.    The complaint that documentation concerning debts to family members were not provided is accurate; however, the justification that no documents as to such debts are in the possession of the debtor, who never had any expectation or even a realistic intention of filing a petition in bankruptcy, the circumstances underlying it occurred suddenly and unexpectedly. As far as to how these debts were incurred was also explained, to wit, that it was done periodically as financial help without any formalities (ie., promissory notes or written receipts). Copies of checks were not preserved because no need was evident at the time of issuance. It is obvious that these debts are not secured and have no precedence. This information was given to the plaintiff's attorney and the trustee on numerous occasions.

44.    The accusation that the debtor "...concealed, destroyed, mutilated, falsified, or failed to keep or preserve any... information..." is simply unwarranted.

45.    In conclusion, it is respectfully requested that

based on all of the foregoing, the Court deny the plaintiff's

-creditor's motion in its entirety.

SAMUEL RACER

Sworn to this 15th
day of June, 2017

MICHAEL MICHAEL
Notary Public, State of New York
No. 02MI5026916
Qualified in Kings County
Commission Expires April 25, 2018

Dated: Brooklyn, New York
      June 15, 2017

SAMUEL RACER, Pro Se
Defendant-Debtor,
1733 Sheepshead Bay Road
Brooklyn, New York 11235
(718)-974-3607
SAMRACERLAW@GMAIL.COM


TO:    DAVID SHAMSHOVICH, Esq.
       Attorney for Claimant
       Rita Shamshovich
       2 Northside Piers, Apt. (25N)
       Brooklyn, New York 11249
       (646) 515-7864
       David.Shamshovich@gmail.com

# EXHIBIT "1"

STATE OF NEW YORK   )
                  :  ss.:
COUNTY OF NEW YORK  )

          Rita Shamshovich, being duly sworn, deposes and states:

          1.   I reside at 3031 Brighton 14 Street, Apt. 5A, Brooklyn, New York 11235.

          2.   I am the original Lessee of a certain Agreement of Lease made May 1, 1989 by and between American Settlers and Traders, Inc. and myself.

          3.   I have duly assigned said Lease to All Purpose Bazaar Corp., c/o Margiotta & Ricigliano, 599 Jerusalem Avenue, Uniondale, New York 11553.

          4.   I have entered into an Agreement with Yakov Shvartsman to exchange all of my shares in All Purpose Bazaar Corp. for shares of another corporation. All that remains to be done under said Agreement is the exchange of the actual shares.

                                     _____
                                        Rita Shamshovich

Sworn to before me this
____ day of November, 1989.

_____
      NOTARY PUBLIC

VICTOR E. SMUKLER
Notary Public, State of New York
NO. 31-4803684
Qualified in New York County
Commission Expires April 30, 1990

420119AF.B01

# EXHIBIT "2"

TELEPHONE (212) 581-6600

## SAMUEL RACER
ATTORNEY AT LAW

FISK BUILDING
250 WEST 57TH STREET, SUITE 917-920, NEW YORK N.Y. 10107

February 3, 1989

TO WHOM IT MAY CONCERN:

This will acknowledge that I am holding in escrow

all of the authorized, issued and outstanding

stock of the following corporations:

       LANDEX ENTERPRISES, INC.,

       354 HAMILTON MANAGEMENT, INC.,

       TRIA REAL ESTATE ENTERPRISES, INC.,

all in accordance with agreements executed this day.

Very truly yours,

SAMUEL RACER

SR/le

# EXHIBIT "3"

Rita Shamshovich
3031 Brighton 14th Street
Brooklyn, New York 11235

> Re:  Landex Enterprises, Inc.
> Tria Real Estate Enterprises, Inc.
> All Purpose Bazaar Corp.
> 354 Hamilton Management Inc.
> West 125th Street Car Wash Corp.
> (herein collectively referred to as
> the "Corporations")

Dear Sir:

The undersigned, Yakov Shvartsman, hereby agrees to sell to you (hereafter referred to as either as "you or Purchaser"), and you do hereby agree to purchase from the undersigned the number of the issued and outstanding capital stock of the "Corporations" as set forth in schedule A, annexed hereto, for the consideration you have paid as set forth in Schedule A.

1.  The shares to be issued to you in All Purpose Bazaar Corp. are an original issue to you: Your payment constituting a contribution to the capital of that corporation.

2.  The undersigned represents to you that (a) Landex Enterprises is in possession of and its primary asset is an option for the property located at 2642 Fulton Street, Brooklyn, N.Y. as well a license agreement for the operation of the real property as a "vendee in possession," (b) Tria Real Estate Enterprises, Inc. is the owner of the land and improvements at 663-673 West 125th Street, New York, New York, subject to a $1,000,000 mortgage, (c) West 125th Street Car Wash Corp. is the operator of the car wash at 663-673 West 125th Street (d) All Purpose Bazaar Corp. is the holder of a lease for premises 2028 White Plains Road, Bronx, New York, which lease contains an option to purchase and (e) 354 Hamilton Management, Inc. is the owner of premises 354 Hamilton Avenue subject to a mortgage of $495,000.

a)  That the Corporations were organized under the laws of the State of New York, each with 200 shares authorized and issued; and

b)  That the Corporations have not been dissolved, nor any of their Certificates of Incorporation amended, canceled or

revoked.

3.    The shares issued to you in All Purpose Bazaar, Inc. are free and clear of liens and encumbrances, fully paid and non-assessable. The shares sold to you in the other Corporations are free and clear of liens and encumbrances except that the shares in Tria are subject to a pledge to Anatoly Kogan, and the Shares in Landex, Hamilton and Tria are all subject to a pledge to Jerome Kessler. Further, some of the Shares to be sold to you are still owned by Mr. Kessler, pending additional payments. The shares in Landex, Hamilton and Tria will therefore not be issued and delivered to you until the debts secured by those pledges are satisfied.

4.    You acknowledge that you have inspected the premises occupied by the Corporations, are fully familiar with he condition of said premises and of the chattels, fixtures and equipment therein contained, and you accept the same "as is" and without any representations made by the undersigned or by any third party thereto.

5.    We mutually acknowledge that there was no broker involved in the within transaction and the same has resulted from direct or primary negotiations between us.

6.    (a) You hereby acknowledge that there were no representations, oral or written, made by the undersigned with respect to business hours, payroll, income, leases, liens, security agreement, quantity or quality of the chattels, fixtures and equipment owned by the Corporations, violations of records or notices of violation, unions or union jurisdiction, creditors of the Corporations or conditions of the premises or with respect to ant other affairs or status of the business of the Corporations or the subject matter of this agreement, excepting as otherwise in this agreement has been represented specifically by the undersigned. You further warrant and represent that no representations, oral or written, have been made by third party whomsoever, with respect to any of the matters set forth in this paragraph, or with respect to any representations made by the undersigned, as otherwise in this agreement set forth.

(b) You further acknowledge certain additional critical facts as follows:

1.    There is a foreclosure action pending against the premises 354 Hamilton Avenue.

2.    Landex is in arrears in rent on its lease.

7.    You acknowledge that I have been represented hereunder by William Walzer, Esq., of 16 Court Street, Brooklyn, New York. You gave elected not to be represented by counsel. You have examined, or have waived examination of all documents that are relevant to your purchase.

8.    That this agreement and our respective rights and obligations hereunder may not and cannot be modified, varied, terminated, abrogated by another contract in writing, entered into and executed in this same manner as the instant agreement.

9.    You further acknowledge that you are aware that I shall sell to Alexander Belkin an equal number of the issued and outstanding shares of stock in the Corporations. I shall be free to sell additional shares to other investors.

10.    We agree to execute among ourselves and Mr. Belkin, a Shareholder agreement which will be similar to the agreement among us and Mr. Kessler dated February 3, 1989 and will restrict our sale of shares and require dilution of our interests in the event that any of us are unable to fund our share of operating shortfalls.

Your countersignature at the foot hereof will constitute your acceptance of the terms, provisions and conditions of this agreement and of your consent thereto and therefore will constitute a binding agreement between us.

5/18/89

Very truly yours,

*Yana Shvartsman* (signature)

YAKOV SHVARTSMAN

CONSENTED TO, AGREED,
AND ACKNOWLEDGED:

*Rita Shamshovich* (signature)

RITA SHAMSHOVICH

R.SHAMSHOVICH

# EXHIBIT "4"

## METROPOLITAN SAVINGS BANK

AVENUE U, CORNER EAST 17TH STREET
BROOKLYN, N. Y. 11229
**OFFICIAL CHECK**

*13,000.00*
2-179235

*Elsa and Samuel Racer*

(REMITTER MUST INSERT PAYEES NAME IN INK ON LINE ABOVE)

DATE    03 DEC 79                                        CK 02 05A

DOLLARS $ ____**$13,000.00******____    DOLLARS $ ____**$13,000.00**____

REMITTER: _____

_____
          (WRITE YOUR NAME HERE)

TO
**MANUFACTURERS HANOVER TRUST COMPANY**

CUSTOMER COPY · NON · NEGOTIABLE

---

TELLERS CHECK

## The Bowery Savings Bank

No. 059088

One Penn Plaza
New York, New York

1-103
210

DATE   1-3-71

PAY TO
THE
ORDER
OF  _____

BOWERY
SAVINGS BANK    **11,000 and 00 cts**    ACCOUNT NO. 594718 7

CUSTOMER COPY — NOT NEGOTIABLE

**BANKERS TRUST COMPANY**
350 5TH AVENUE
NEW YORK, N. Y. 10001

TELLER

TELLERS CHECK
No. 059091

## The Bowery Savings Bank
One Penn Plaza
New York, New York

$\frac{1\text{-}103}{210}$

DATE

PAY TO
THE
ORDER
OF

BOWERY
SAVINGS BANK **2800**dols**00**cts

ACCOUNT NO.

CUSTOMER COPY — NOT NEGOTIABLE

TELLER

BANKERS TRUST COMPANY
350 5TH AVENUE
NEW YORK, N. Y. 10001

4-594-1187-7

---

TELLERS CHECK
No. 059092

## The Bowery Savings Bank
One Penn Plaza
New York, New York

$\frac{1\text{-}103}{210}$

DATE

PAY TO
THE
ORDER
OF

BOWERY
SAVINGS BANK **1000**dols**00**cts

ACCOUNT NO.

CUSTOMER COPY — NOT NEGOTIABLE

TELLER

BANKERS TRUST COMPANY
350 5TH AVENUE
NEW YORK, N. Y. 10001

4-594-7187-9

---

TELLERS CHECK
No. 059090

## The Bowery Savings Bank
One Penn Plaza
New York, New York

$\frac{1\text{-}103}{210}$

DATE

PAY TO
THE
ORDER
OF

BOWERY
SAVINGS BANK **4000**dols**00**cts

ACCOUNT NO.

CUSTOMER COPY — NOT NEGOTIABLE

TELLER

BANKERS TRUST COMPANY
350 5TH AVENUE
NEW YORK, N. Y. 10001

4-594 1187-7

# EXHIBIT "5"

CLOSED_____at_____M. at office of_____

THE FOLLOWING PERSONS WERE PRESENT: *Pacer - Peter Parisi; Nicoreno Parise. Harold J. Robbins Mike Maugino - Connolly; Frank Catalano (Closer) Lorraine Glaser*

| I T E M S | | CREDIT TO BUYER | | CREDIT TO SELLER | |
|---|---|---|---|---|---|
| | | | | Title Company Closer: | |
| PURCHASE PRICE | | $ ~~80,000~~ | | $ 80,333 | 00 |
| PAID ON ACCOUNT OF PURCHASE PRICE | | 8000 | 00 | | |
| 1st MORTGAGE BALANCE | | 40,771 | 56 | | |
| Interest at  % from   to | | | | | |
| 2nd MORTGAGE BALANCE | | | | | |
| Interest at  % from   to | | | | | |
| PURCHASE MONEY MORTGAGE | | | | | |
| INSURANCE APPORTIONED (SEE SCHEDULE) | | | | | |
| TAXES  *R.E.* | | | | 91 | 00 |
| | *interest* | 40 | 00 | | |
| | *printing* | 200 | 00 | | |
| WATER | | | | 82 | 00 |
| SEWER | | | | | |
| ~~FUEL~~  *Escrow* | | | | 307 | 71 |
| RENTS (SEE SCHEDULE) | | | | | |
| OTHER ADJUSTMENTS | | | | | |
| | | | | | |
| TOTAL CREDIT TO SELLER | | | | $ 80,813 | 71 |
| TOTAL CREDIT TO BUYER | | $ 49,011 | 56 | 49,011 | 56 |
| BALANCE DUE SELLER | | | | $ 31,802 | 15 |

| DISBURSEMENTS BY PURCHASER | | PURCHASE PRICE PAID AS FOLLOWS | | |
|---|---|---|---|---|
| $ | | | $ | 2.15 |
| Mortgage Tax | | By Cash | | |
| Recording Mortgage | | By Check | | |
| Recording Deed | | 2-179235 *Metropolitan* | | 13,000 |
| Title Company Fee | | 059088 *Beverly* | | 11,000 |
| Survey | | 059090 *Bowery* | | 4,000 |
| Drawing Bond and Mtge. | | 059091 *Bowery* | | 2,800 |
| | | 059092 *Bowery* | | 1,800 |
| *BMOS* | | DISBURSEMENTS BY SELLER | | |
| *Commissions* $ *5933* | | $ | | |
| *ABC = 7700* | | N. Y. State Stamps on Deed | | |
| *Tommy 2133* | | N. Y. City Deed Tax | | |

Fee Title Insurance was obtained in the amount of $

# EXHIBIT "6"



# BROOKLYN FEDERAL SAVINGS
## AND LOAN ASSOCIATION

BOROUGH HALL OFFICE
81 COURT STREET · BROOKLYN, NEW YORK 11201 · (212) 855-8500

Harold J. Robbins
95 Court Street
Brooklyn, N.Y.



November 16, 1979

Re: 7384
Mr. & Mrs. Parisi
2330 E. 70th St.
Brooklyn, N.Y.

Dear Sir:

In accordance with your request, we give you the following information
on the above captioned loan:

The present unpaid balance is $ 40,771.56 with interest at 8 3/4% paid
through November 30, 1979.

The balance in the Escrow account is $ 307.71 , 2nd Quarter Real
Estate Taxes 79/80 paid 10/79 in the amount of $ 317.18 ,
Water & Sewer paid 79/80 7/79 in the amount of $ 144.37

The amount of monthly payment is $ 469.00 , of this amount $ 350.61
is credited to principal and interest and $ 118.39 to the Escrow account.
This account is set up for tax purposes only. We do not accrue for Fire
Insurance. Where applicable: We are presently accruing $ N/A for
Life and/or Disability Insurance.

Please be advised that it will be necessary for an Attorney to write
our office when the transfer of the property is made. If an Attorney's
letter is not possible, it will be necessary for us to receive a
photostatic copy of the deed for our records.

We are enclosing a signature card, a purchaser's personal information
sheet and an assignment of escrow form which must be completed and
returned to us.

Should there be any further charges other than stated above, the
Association cannot be held responsible.

It is the policy of the Association to issue on an annual basis a yearly
statement in January. However, in cases where loans are sold subject to
the existing mortgage, we issue a statement to the seller at the time we
change our records. Therefore, it will be necessary for you to advise
the undersigned of the exact date of transfer and unless we are otherwise
notified by you, we will credit the above with the interest and taxes
paid to the date of transfer.

Please ensure that any remaining payment coupons are turned over to
the new owners.

Very truly yours,

Mortgage Officer

COPY

Encl.

# EXHIBIT "7"

## AGREEMENT

AGREEMENT made August 21ˢᵗ, 2009, by and between ELSA RACER, residing at 2330 East 70ᵗʰ Street Brooklyn, New York, (hereinafter referred to as the "Wife" ), and SAMUEL RACER, residing 2330 East 70ᵗʰ Street, Brooklyn, New York (hereinafter referred to as the "Husband" ).

1.   The parties were married on July 29, 1973, in Brooklyn, New York.

2.   There are two children of the marriage, to wit, JACQUELINE A. RACER, born on April 22, 1978; MARLENA I. RACER, born on May 24, 1982, now emancipated.

3.   There are no expectant issue of the marriage.

4.   Certain unhappy and irreconcilable differences have arisen between the parties as a result of which they have separated and are now living a separate and apart from each other.

5.   The parties desire that this agreement, which is entered into after due and considered deliberation, shall be and constitute an agreement between them with respect to the distribution of any and all marital and/or separate property, maintenance.

NOW, THEREFORE, it is mutually agreed as follows:

## ARTICLE I

### - SEPARATION -

1.  Except as may be specifically provided to the contrary in this agreement, it shall be lawful for each party to live separate and apart from each other and to continue to live separate and apart from each other, free from interference, authority or control, directly or indirectly, by the other as fully as if he or she were sole and unmarried. Each party may conduct, carry on and engage in any employment, profession, business, trade or personal relationships which to him or her may seem fit and advisable for his or her own sole or separate use, free from any control, restriction or interference, direct or indirect, by the other party.

2.  Neither party shall attempt to compel the other to cohabit or dwell with him or her.

3.  Neither party shall institute any action against the other for the resumption of the conjugal rights and privileges of the parties hereto.

4.  Neither party shall molest, harass, disturb or annoy the other.

ARTICLE  II

DISCLOSURE STATEMENTS

1.    The parties represent to each other that the disclosure statements have been provided by each party to the other prior to this agreement. Each party has made independent inquiry into the complete financial circumstances of the other and is fully informed of the income, assets, property and financial prospects of the other. Each has had a full opportunity and each has consulted at length with his or her attorney regarding all of the circumstances hereof and acknowledges that this agreement has not been the result of any fraud, duress, or undue influence exercised by either party upon the other, or by any other person or persons upon the other. Both parties acknowledge that this agreement has been achieved after full inquiry into their respective financial circumstances, competent legal representation and honest negotiations.

2.    This agreement is entire and complete and embodies all understandings and agreements between the parties, and no representations, agreements, promise, undertakings or warranties of any kind or nature have been made to the other to induce the making of this agreement except as are set forth in this agreement. Neither of the parties shall heard to assert that there is any other prior written agreement, oral or written existing between

them. Each party is satisfied that this agreement and all of the terms and provisions hereof is fair and equitable. Each party is also aware of the risks of litigation and this agreement is made, among other things, in light of the foregoing. The parties acknowledge to each other that they have sufficiently reviewed this agreement, understand the terms hereof, and are entering into this agreement freely and voluntarily. Each is specifically aware of their rights under the Equitable Distribution Law (so-called) of the State of New York, concerning marital property, separate property and other financial matters and has had the opportunity to investigate the others income and assets. Each party has given due and considered deliberation to the terms of the agreement and clearly understands and assents to all of the provisions hereof, and further acknowledges that this agreement constitute a fair and adequate settlement.

ARTICLE III

PERSONAL PROPERTY

1.  In consideration of the mutual promises contained herein and other good and valuable consideration, the marital home known as and located at 2330 East 70th Street, Brooklyn, New York (Block 8447 Lot: 52 ) shall be transferred and conveyed to the Wife, ELSA RACER, and hereby declared to be the sole and exclusive property of

the wife together with all household articles, furnishings, furniture, goods and effects now located therein and the husband, SAMUEL RACER, hereby premises, releases and quitclaims the said real and personal property to the wife, her heirs and assigns forever.

2.   Except as otherwise provided, all personal property now in the possession of the wife shall be and remain the sole and exclusive property of the wife and all similar personal property of the husband shall be and remain his sole and exclusive property.

3.   Except as otherwise provided herein, the above-mentioned personal property settlement shall be deemed a final division of property under the laws of the State of New York and the parties agree that any property acquired after the effective date of this agreement shall be his or her own separate property, respectively. The parties acknowledge that the aforesaid property division is fair, equitable and appropriate in view of the support provisions herein.

### ARTICLE IV

#### MUTUAL RELEASE AND DISCHARGE OF CLAIMS IN ESTATE

Subject to the provisions of this agreement each party hereby release, waive and relinquishes any and all rights which he or she may now have, or may hereafter acquire, as the other party's

spouse, under the present or future laws of any jurisdiction, to share in the estate of the other party upon the latter's death and, to act as executor or administrator of the other party's estate. This provision is intended to, and shall constitute, a mutual waiver by the parties to take against each other's wills, now or hereafter in force, under the present or future laws of any jurisdiction whatsoever. The parties intend, by the afore described waiver and release, to relinquish any and all rights in and to each other's estate including the rights of set-off now provided in Section 5-3.1 of the Estate, Powers and Trust Law of the State of New York, and any and all distributive share presently provided for in Section 4-1.1 of the Estates, Powers and Trust Law and all rights of election presently provided for in Section 5-1.1 of said Law or any prior or subsequent similar provision of law of this or any other jurisdiction.

## ARTICLE V

### MUTUAL RELEASE AND DISCHARGE
### OF  GENERAL CLAIMS

Subject to the provisions of this agreement, each party has remised, released and forever discharged, and by these presents does for himself, and his or her heirs, legal representatives, executors, administrators and assigns remiss, release and forever

discharge the other of and from all cause or causes of action, claims, rights or demands whatsoever, in law or in equity which either of the parties hereto ever had or now has against the other, except any and all cause or causes of action for divorce and any defenses either may have to any divorce action now pending or hereafter brought by the other.

ARTICLE VI

PROPERTY DISTRIBUTION AND

SUPPORT AND MAINTENANCE

The parties mutually acknowledge that they are owners by the entirety of a certain house and lot ("marital home") known as 2330 East 70th Street, Brooklyn, New York.

As and for a full and final distribution of marital property, and as and for a lump sum settlement of all claims, the Husband agrees to convey and transfer to the Wife his entire right, title, and interest in the aforesaid marital home, subject to the existing mortgage in the sum of approximately $368,000.00 now held by BANK of AMERICA and carrying charges.

The Husband hereby grants to the wife Power of Attorney, if necessary, to make such transfer and execute any and all documents in his name, necessary in order to accomplish same.

The Wife agrees to accept such transfer and conveyance as and

for a full and final distribution of marital property and shall indemnify and hold harmless the Husband from the payments under the mortgage, taxes, insurance, maintenance and all carrying charges.

HOWEVER, for as long as the HUSBAND continues to occupy the ground floor portion of the house to which the WIFE consents and agrees, he shall be responsible to contribute at least 50% toward the mortgage, taxes, insurance, utilities, maintenance and all carrying charges of the house.

## ARTICLE VII

## REMARRIAGE OF THE WIFE

The wife shall be deemed to have remarried if the wife enters into a marriage with a person other than the husband, in the event that there shall be a divorce between the husband and the wife herein OR if the wife shall reside with a male over 18 years of age who is not the husband for a continuous period in excess of six months.

## ARTICLE XII
## MEDICAL AND LIFE INSURANCE COVERAGE

1.   The Wife and the Husband shall each be responsible for the cost of his or her respective medical insurance and expenses from this day forward.

## ARTICLE XIII

### RECONCILIATION AND MATRIMONIAL DECREES

This agreement shall not be invalidated or otherwise affected by a reconciliation between the parties hereto, or a resumption of marital relations between them unless said reconciliation or said resumption is documented by a written statement executed and acknowledge by the parties with respect to said reconciliation and resumption and, in addition, setting forth that they are cancelling this agreement, and this agreement shall not be invalidated or otherwise affected by any decree or judgment of separation or divorce made by any Court in any action which may presently exist or may hereafter be instituted by either party against the other for a separation or a divorce, and the obligations and covenants of this agreement shall survive any decree or judgment of separation or divorce and shall not merge therein, and this agreement may be enforced independently of such decree or judgement. The provisions of this agreement shall be incorporated in any judgment of divorce which either party may hereafter obtain against the other, and each party seeking relief in such an action agrees to submit the terms hereof for such incorporation and not any other provisions. The provisions of this article shall not, however, constitute or predicate a merger of this agreement in any judgment or decree in

any matrimonial action between the parties now pending or which may hereafter be instituted, and this agreement shall survive any such judgment or decree; notwithstanding the provisions of this article.

## ARTICLE XIV

## INCOME TAX RETURNS

If in connection with any joint income tax returns heretofore or hereafter filed by the husband and wife there is any deficiency assessment, the amount ultimately determined to be due thereon, including penalties and interest, shall be paid by the husband, unless and to the extent that the same has been caused by failure or neglect of the wife to disclose any income which should have been included in such returns, in which event and to that extent she shall bear such expense to the extent allocable to such failure or neglect. Each party agrees to cooperate fully with the other in the event of any audit or examination by a taxing authority of the aforesaid joint tax returns and agrees to furnish to the party being examined or his or her designees, promptly and without charge, such authorizations, powers of attorney, papers, records, documents and any information as may be reasonably appropriate in connection with such audit or examination. In the event that either party fails to execute any such papers so requested of the other after reasonable notice, the party seeking

such authorizations may execute the same on behalf of the other party and shall forward copies thereof to the other party.

## ARTICLE XV

### REPRESENTATION AND COUNSEL FEES

The parties hereby acknowledge that the wife has been represented by an attorney of her choice and the husband was self-represented and prepared this agreement, based upon the terms and conditions agreed to by the parties as the result of direct negotiations between them and their respective counsel. The Wife acknowledges and states that he has been represented in connection with the negotiations preceding the execution of this agreement, and in connection with his review of this agreement, by an attorney of his own choosing, and has had said attorney review this agreement has consulted with said attorney concerning the provisions hereof and has had said attorney advise her with respect thereto. Each party shall be solely responsible for the payment of his or her own attorney's fees for services rendered in connection with the negotiation and preparation and review of this agreement. Each of the parties hereby warrants and represents to the other that he or she has dealt with no other attorney(s) for whose services the other is or may become liable and indemnifies and holds the other harmless of all loss, expenses (including

reasonable attorney's fees and disbursements) and damages in the event of a breach by a party of such representation and warranty. However, notwithstanding anything in this article to the contrary, in the event that either party shall default in any of his or her obligations under this agreement or if he or she shall challenge unsuccessfully the validity of this agreement or its interpretation, then that party shall be liable for the cost and expenses of the other party as a result thereof, including but not limited to reasonable attorney's fees.

## ARTICLE XVII
### DEBTS

Each of the parties covenant and represent that neither has heretofore incurred nor shall at any time hereafter incur any debt, charge, obligation or liability whatsoever for which the other party, his or her legal representatives or property or estate may become liable and from and after the date hereof each will be solely and individually responsible for all bills incurred by him or her respectively and shall hold the other harmless therefrom and shall indemnify the other against any debts, liabilities, or charges.

ARTICLE XVIII

MISCELLANEOUS

1.    The HUSBAND and WIFE shall, at any and all times, upon request by the other party or his or her legal representatives, make, execute and deliver any and all such other and further instruments as may be necessary or desirable for the purpose of giving full force and effect to the provisions of this agreement without charge thereof.

2.    The parties agree that each will notify the other by registered or certified mail, return receipt requested, of any change of address and/or telephone number, within five (5) days of such change. In all other respects each party shall have the right to reply upon the respective addresses stated hereinabove and serve any and all notices, legal or otherwise at the address stated above with a copy thereof mailed to the respective attorney.

3.    The terms of this instrument fulfill, and are in full satisfaction of and discharge and release, any and all claims and demands which the wife has or may have against her husband arising out of the matrimonial relationship, including but not limited to equitable distribution, distributive award, division of marital property, and claims against the husband's separate property, and she likewise guarantees her husband against claims or demands of

any other person, firm, or corporation, which may arise out of the support and maintenance of herself and the support, maintenance, education or care of the child of the parties.

## ARTICLE XIX

### GENERAL PROVISIONS

1.    This agreement and all the obligations and covenants contained herein shall enure to the benefit of each of the parties and their respective heiress; executors, administrators, legal representatives and assigns.

2.    This agreement and its provisions merge any prior agreement of the parties and is the complete and entire understanding of the parties.

3.    This agreement shall be governed by the laws of the State of New York.

4.    Each of the parties hereto, without cost to the other, shall at any time and from time to time hereafter execute and deliver any and all further instruments and assurances and perform any acts that the other party may reasonably request for the purpose of giving full force and effect to this agreement.

5.    The parties acknowledge that they are entering into this agreement freely and voluntarily.

6. Any waiver by either party of any provisions of this agreement or any right or option hereunder shall not be deemed a continuing waiver and shall not prevent or estop such party from thereafter enforcing such provision, right or option, and the failure of either party to insist in any one or more instances upon the strict performance of any of the terms of this agreement shall not be construed as a waiver or relinquishment for the future of any such term or provisions, but the same shall continue in full force and effect.

7. Each of the parties has read this agreement prior to the signing thereof.

8. In the event any term, provision, paragraph or article of this agreement is or is declared illegal, void or unenforceable, the same shall not affect or impair the other terms, provisions, paragraphs or articles of this agreement. The doctrine of severability shall be applied. The parties do not intend by this statement to imply the illegality, voidness or unenforceability of any term, provision, paragraph or article of this agreement.

9. This agreement is being executed in four original counterparts each of which shall be deemed an original.


[signature page and acknowledgments follow]

IN WITNESS WHEREOF, the parties have set their hands and seals, this 21ˢᵗ day of August, 2009.

_____
ELSA RACER

_____
SAMUEL RACER

STATE OF NEW YORK )
                        ss:
COUNTY OF Kings )

On the 21st day of August, 2009, before me personally came ELSA RACER, to me known and know to me to be the individual described in and who executed the foregoing instrument, and acknowledged to me that she executed the same.

MICHAEL MICHAEL
Notary Public, State of New York
No. 02MI5026016
Qualified in Kings County
Commission Expires April 25, 20/2

STATE OF NEW YORK )
                        ss:
COUNTY OF KINGS )

On the 21st day of August, 2009, before me personally came SAMUEL RACER, to me known and known to me to be the individual described in and who executed the foregoing instrument, and acknowledged to me that he executed the same.

MICHAEL MICHAEL
Notary Public, State of New York
No. 02MI5026016
Qualified in Kings County
Commission Expires April 25, 20/2

# EXHIBIT "8"

```
 1                        RACER

 2                  INDEX TO REQUESTS

 3    DESCRIPTION                              PAGE

 4    Copy of the rent stipulation            92

 5    Marital agreement                       170

 6    Mortgage documents                      175

 7    All checks in connection with the closing  176

 8    Gershon Booso promissory note           195

 9    Promissory notes and checks from        202

10    Mr. Szpanderfer

11

12    Documents relating Lazar Feygin loan    206

13

14    Documents relating to Shurka loan       219

15

16    Document relating to Gennady Borukhovich 241

17

18    Net Capital Mortgage                    242

19

20    Documents relating to the Nashtatik loan 249

21

22    Copy of check from Mr. Szpanderfer      285

23

24

25
```

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re:    SAMUEL RACER,
                    Debtor,

RITA SHAMSHOVICH,
                Plaintiff,
        -against-
SAMUEL RACER,    Defendant
------------------------------------------------------X

Case No.  1-16-41843-cec

Chapter:  7

Adv. Proc. No. 1-16-01146-cec

## CERTIFICATE OF SERVICE

The undersigned certifies that on _____June 15, 2017_____, a copy of the annexed papers was

served by depositing same, enclosed in a properly addressed postage-paid envelope, in an

official depository under the exclusive care and custody of the United States Postal Service within the

State of New York, upon *[below specify the name and mailing address of each party served]*:

DAVID SHAMSHOVICH, ESQ.
2 Northside Piers (Apt. 25N)
Brooklyn, New York 11249

Dated: _____June 15, 2017_____

_Inna Yakhnis_
INNA YAKHNIS *(Signature)*

Rev. 5/2012

UNITED STATES
BANKRUPTCY **COURT**   FOR THE EASTERN DISTRICT
   OF **NEW YORK,**

In Re: Samuel Racer,

        Debtor,

Rita Shamshovich,

        Plaintiff,

   -against-

Samuel Racer,

        Defendant,

Case No:   1-16-41843

Chapter 7

Adv Proceeding No:
1-16-01146-cec

AFFIDAVIT IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

SAMUEL RACER, Pro Se
Debtor-Defendant
1733 Sheepshead Bay Road
*Office and Post Office Address, Telephone*
Brooklyn, New York 11235
(718)-974-3607

**To** : David Shamshovich, Esq.
    Attorney for Claimant
    2 Northside Piers (Apt. 25N)
    Brooklyn, New York 11249
    (646)-515-7864

**Attorney(s) for**

**Signature (Rule 130-1.1-a)**

_____

Print name beneath

Service of a copy of the within is hereby admitted.

Dated: _____

**PLEASE TAKE NOTICE:**

☐ NOTICE OF ENTRY

that the within is a *(certified) true copy of a*
duly entered in the office of the clerk of the within named court on

☐ NOTICE OF SETTLEMENT

that an order
will be presented for settlement to the HON.
within named Court, at
on                at        M.

Dated:

of which the within is a true copy
one of the judges of the